Case number 14-1166-8L, ManorCare of Kingston PA, LLC Petitioner v. National Labor Relations Board Mr. Roberts for the petitioner, Ms. Isbell for the respondent Good morning, Charles Roberts here for ManorCare, HCR ManorCare. We're bringing two issues before the court. The first concerns whether a regional director of the labor board appointed by the board at a time when it did not possess a quorum had authority to conduct a representation election, and if not, what the remedy should be. And the second issue concerns whether the board properly and consistently applied its Westwood Horizons standard test for third-party threats. We would argue that the answer to those questions is that the board did not properly conduct this election and that it did not properly apply its Westwood Horizons test. On the power issue, this case is unlike the cases that this court has already decided in SSC, Mystic, and UC Health. Here the issue is not the board's lack of a quorum at the time of the election. The issue is that the regional director, by all concessions, appears to have been admitted that he was appointed at a time when there was no quorum. And so the issue becomes really one of there's a violation, but what is the remedy? Before I go there, I mean, I think I agree with you that this is different from the issues in the prior cases precisely for the reasons that you state. But if that's so, then it seems to me that there's a different argument as to whether you forfeited the claim by failing to raise it during the representation proceeding. Because under SSC and UC Health, the argument was, well, it didn't matter that it wasn't raised because the claim that was being made went to the authority of the board. And you can bring a claim with respect to the authority of the agency, notwithstanding a failure to raise it before because we allow that under our decisions. But as you rightly say, your claim is not about the authority of the board to take the action. It's about the regional director. With all due respect, SSC Mystic, there was a secondary argument in advance in which they contended that the board lacked the authority to expand the regional director's jurisdiction. It had been Connecticut, and they expanded it to Massachusetts. And the court rejected the waiver argument even in the context of that argument and took the position that it went to the same power issue and was not waived. I didn't read our decision to specifically speak in terms of waiver with respect to that because I thought that we were talking about forfeiture on the general notion that the board lacks authority and therefore the regional director lacks authority. Well, I could stand corrected, Your Honor, but I did read that, and I do believe that the court specifically rejected the waiver argument in that context. Again, I could stand corrected on that, but I'm pretty confident that that is the case and that on the merits, it basically didn't address the issue because the election took place in Connecticut where the regional director had already had preexisting authority. That's not the case here because Regional Director Walsh was not a preexisting regional director. He did not become the regional director until March of 2013, which was when the board did not have a quorum. It was after this court's Noelle Canyon decision at a time when the board had knowledge of the defect and continued on. Well, can I ask you this? I take your point about SSE, and we'll look carefully at the part of the decision that you're alluding to. But for that, let's just assume that away for present purposes and assume that it doesn't say that. Then, as an analytical matter, it seems to me there's a distinction between an argument that says that the board lacks authority and, therefore, the regional director lacks authority, which is the argument that was being made in SSE and UC Health and your argument, which is that the regional director is an invalidly appointed officer, and, therefore, the regional director couldn't have conducted the election. And that's the type of thing that it could have been raised. And it seems to me the difference is this, that if it had been raised, something could have been done. Because at the time, the board did have a quorum, and so the board could have made the regional director, the regional director validly appointed regional director, in which event there would have been no claim that he lacked authority to conduct the election. Well, the stipulated election agreement was entered into before the board acquired a quorum, and so there was really no procedural vehicle by which the employer could have raised the issue at that point. I mean, you entered into the stipulated election agreement. I mean, I guess the question is, is there any process whereby that issue could have been brought before the board? And it's hard for me to say. No, Your Honor, because the way these things work is the board, it's not just a quasi-judicial body. It actually conducts these elections. And, you know, this court in both of UC Health and SSC Mystic found that entering into a stipulated election agreement was simply a means of applying the board's procedures to these elections. And once you stipulate to the election, the board conducts the election, and then you can raise objections. And in the representation proceeding, well, you can't litigate. There's only certain things you can litigate, and that has to do with the conduct of the election, not the board's power. The board doesn't allow you to litigate what I would call administrative or legal questions like that. Now, we did raise them. But the board says it does. I mean, the board wanted you to raise that claim at the representation phase. And we did raise it in the representation case. Well, I'll take that back. Maybe not. We raised it in the following Supreme Court's decision. We raised it. I apologize. We raised it in the C case, which is the ULP case. Exactly, right. It's the vehicle by which the election gets here. So, I mean, I understand your argument, but I would take the position, even independent of S.C. Mystic, is that you're talking about a structural issue in the sense that under the Appointments Act, the regional director is an inferior officer, we would contend, but Section 4 of the Act gives the board the power to appoint him. As an inferior officer, he's got to be appointed either by the president or by a department head, in this case the board. And if the board didn't have a quorum, then, in essence, you've got an appointment. Indirectly, you've got an appointment. Indirectly is important because I never understood your argument to be that the appointment of the regional director itself was a constitutional problem. The problem was, as Noel Canning makes clear, that the board lacked authority. So there was a constitutional problem with the board doing something. But then once the board appoints the regional director, there's a one step removed from the question that was confronting the Supreme Court and Noel Canning. Well, I understand your argument. But the best I can say is what I have said. I would rely on S.S.C. Mystic and on what I believe is more of a power issue than just a – this isn't a technical defect. It's not like there was some ministerial mistake that was made. So I think that we would stand on that for whatever. The only thing, and I think – I don't want to belabor the point too long, but it may not be a technical defect. But there are cases – there's a Supreme Court case, the Tucker-Truck case, where everybody agreed that the officer was appointed in violation of the APA. And yet waiver – normal forfeiture and waiver rules were applied to that. Yeah, and I do believe there are cases coming from district courts where they considered the waiver argument. And I honestly can't give you a case or say, you know, why there is a distinction. But, I mean, I do believe that in the context of this agency review process and in the context of the appointment of a regional director, that it is an issue that we did not waive. And if we didn't waive, I'd like to quickly move into the merits of what the remedy is. I mean, this is entirely different from Legitech and Doolin, where you had a record that was built and they simply – the process was initiated by someone without power. And then after the defect was discovered, like the FEC reconstituted itself and independently, you know, reviewed it. There is no record here. The harm here was in conducting the election at a time when the regional director didn't have that power. It's a human experiment. It's not a record that you build. And the results today could be dramatically different. There's a – the electorate is constantly changing in these cases. I mean, you know, the – So does that argument mean that there's just – you can't, as a matter of law, have ratification after the fact? So even if it was an hour later? Well, I would say yes. To answer your question directly, yes. I mean, you've – the harm is in the act having taken place. Obviously, an hour later becomes a, you know, a question of is that too fine a line to draw? But technically, it's – that would be our argument. Obviously, here it's a year later and significant changes in the electorate. So I think that the remedy here, you know, the harm – And the other thing is there's an easy solution. Simply rerun the election. They don't have to start the process over. Simply direct another election. That can be done in less than 30 days. This court's order could issue and we could have another election within 30 days of that order. So, I mean, this – Yeah, that's true. But I don't know that I would – that characterizing it just as an easy solution makes a whole lot of sense. Because there are – at least under the way we normally look at board events like this, an election is a consequential event and it's not costless to rerun an election or else we'd have reruns of elections a lot more often than we do nowadays. Well, but, you know, there is a difference on my second argument. The second issue is a substitute objection to the course of the election. Most assertively, you don't rerun them willy-nilly. And we don't think that this – that we raise, you know, insignificant issues. And I'd like to quickly turn to that because I am running short on my time here. But, you know, the West – everyone concedes that Westwood Horizon's standard applies, but we would submit to the court that the board did not apply that standard. It applied some ad hoc analysis of the issues. You know, it's a five-part test. It's got to be ad hoc, at least in the sense of very factually focused. It was factually focused on a very narrow issue, though, Your Honor. Very factually focused on – the standard is a reasonable person's standard or a reasonable employee's standard. It's not – it's could a reasonable – in terms of determining whether there was, in fact, a threat, is could a reasonable employee interpret the remarks as a threat. They don't view the subjective intent. And that's what the board focused on. The board focused on the intent of the speakers and found that they did not have intent to carry out their threats. They wholly ignored, Your Honor, the fact that the most – by far the most significant threat was the one that occurred the day before the election by an individual who had a known history of violence and had a knife wound, a visible knife wound to prove it. The board makes no mention of that. The hearing officer did. The hearing officer, of course, found that the circumstances were such that the election should be rerun, that there was that proof of fear. Remember, this was a one-vote margin. A one vote – a change of one vote would have changed the result in this election. They totally emasculated the dissemination factor by taking the position that these were rumors devoid of truth. These were not rumors. They were directly heard. There's no finding that there was no actual statements. There were statements that they're going to punch people in the face if the union doesn't get in, that they're going to slash employees' tires. Very serious on their face. The board totally discounted the literal words. And the question is, it's really the judgment of an employee. The board was supposed to put itself in the shoes of a reasonable employee, not – this is a little bit different. I recognize the deferential standard of review, but under the legal standard, the substantive standard, the board had to put itself in the shoes of a reasonable employee,  It made its own independent judgment that, you know, there's nothing in here in the record, we believe, that would support the conclusion that no reasonable employee could interpret those as a threat. Then they didn't even look at the proximity to the election. These were the evening before the election. The election started at 6.30 the following morning. There's dissemination of the threat around 6 and 6.30. There's clusters of employees talking about – particularly, they seem to be most concerned about the threats to their cars. And one employee testified in the record that's in our brief that, you know, it took her a long time to get that car, and she was concerned. These threats were so serious, they were brought to management's attention, and they had to arrange for security for three days after the election. And one of the employees who testified that she made her husband drive her to work in the following days because she was afraid of what would happen to her car. I just don't think you can, in good conscience, and if you compare one of the cases they rely upon, Lamar – there may be another Lamar, I send their brief in hours too – if you compare the analysis in that case to the analysis in this case, it's like night and day. The board in that case went through every one of the factors. The other thing I would say is that these were not colloquialisms or figures of speech. This wasn't I'm going to kick your ass or things like that. And the board relies on a lot of cases where figures of speech are used. These were serious threats that no one could contend that literally they were not threats. So I don't think – and then finally, the jest issue. I think Shakespeare said jesters often prove prophets. Truth is often said in jest. And some of these employees testified that even though – one of them testified – even though she initially took it as a joke, when she sat down and thought about it, she didn't think it was a joke. Now, her subjective reaction is not really relevant, but the point is that the record does not contain evidence, in our opinion, that would support a finding that no reasonable employee could be intimidated by that. And so we would respectfully ask the court under either of these theories to set aside the election and direct a new one. If there's no questions, thank you. Thank you. May it please the court. Kelly Isbell here on behalf of the National Labor Relations Board. And I will first apologize. I have a lingering cough, and I hope to keep it under control, but just in case. I think I should start by discussing the threats. The board found there were no threats. There were two statements made in jest among coworkers outside the building. There were, in fact, no threats made. Well, are you saying, then, that the woman who had her husband drive her in was unreasonable? Otherwise, if she was reasonable, that would be evidence, I would think, that a reasonable person could feel threatened. But in this case, what happened was that the actual statements, the statements that have been charged as evidence that the election should be overturned were in jest. You're talking about the board's conclusion. Right. If there had been a big neon sign saying, What I'm about to say is in jest. Don't worry. Then perhaps the woman who had her husband drive her in would be completely unreasonable. But I don't recall evidence of a big neon sign. There were no neon signs. That's just the board's conclusion, nothing more. Yes, Your Honor, but remember how these were disseminated. A single employee, one employee, heard both statements and disseminated them out of context and exaggerated them. Harriet Robinson was the person who told people that Juanita Davis was going to hurt them with a bat. That is not, in fact, what the evidence showed Juanita Davis joked about. She told management the day of the election that there were multiple people standing outside the voting, wherever the voting was, to hurt people if they didn't vote for the union. This is not at all what Keating or Davis said. It was, in fact, Harriet Robinson that exaggerated these statements and was the source of the dissemination. There is no finding that she intentionally set out to sabotage the election, but she was a company observer. There's certainly no allegation that the company intended for her to sabotage the election. But what that shows is that the board is entirely reasonable in deciding that third-party statements cannot easily overthrow an election. You can't allow a third party to sabotage an election on the basis of false accusations or jokes. Every election will be in peril if anyone can frighten people with that in the outing. It seems to me what you're describing as false accusations aren't false at all. What you're really saying is if that statement is not repeated with stenographic accuracy, with descriptions of how exactly the person said it, then suddenly it's not dissemination, it's distortion and mischaracterization. That seems to be really kind of an impossible standard. Then you can't ever have dissemination because you have to be able to say it exactly as it was said to you. But the statement that is objectionable was the statements made by Keating and Davis. The board found that those were intended in jest, and the hearers at the time took them to be in jest. Well, except that Kovacs said, when I thought about it later, I thought maybe it wasn't in jest, right? Yes, she did. If she then repeated that without saying, but it was a joke, it seems like what you're saying here is the board would say, well, that's not dissemination, that's gossip, right? Even though that would be her actual view of what happened. The board would not say that was not dissemination. In fact, Kovacs disseminated nothing. She told no one about this. There's a Facebook conversation in the record where she is discussing this with someone else who heard it, and they characterized it as a joke. No, they don't characterize it as a joke. The other person did, and she did not. And you basically say, well, that must be attribution because she didn't correct that. And, yeah, it would be just as easy to say she didn't think she had to correct it. She had her view of what was happening. This person had their view of what was happening. I think that's a stretch. If Kovacs had, Kovacs herself may have been frightened. I'm sorry, may have been. She may have thought that the joke was not in jest after she. So let's take that as a given. But a single statement is not enough to overturn an election. There has to be something more. These are third-party statements. They're not statements by union agents or employer agents. For third-party statements, there's a heightened standard. And we don't, the board does not normally overturn an election on the basis of statements made before the election. People say things. So let's assume they're not in jest. People say things. In a hard-fought election, especially, there are hard feelings. But in this case, there was no violence. There were no attacks on the cars. Juanita Davis was, had been in a fight and it hurt her finger. But there was no evidence that she was ever in a fight at the office, at the facility, or that anyone was actually afraid of her. Are the third-party cases where the objectionable statements are made in the opposite direction? Opposite direction, meaning? Meaning that it's not somebody who is pro-union, but it's somebody who is anti-union. I'm sure there are. I mean, the standard applies in going both ways. Right, but I'm wondering, has it actually been applied going both ways? Off the top of my head, I can't think of one where the employees are, I can't think of one. But I know it applies in both situations. And who would be considered third parties if it was the case that it went in the opposite direction? Employees. Employees because management wouldn't? What would the dividing line be? Well, then you would get into an agency test, right? So if the supervisor did it, is the supervisor an agent of the employer? But definitely employees could be third parties either way. They would be third parties? Yes. In either direction. Would you like to move on? Well, no, I'm really quite interested in the way the board looks at it. There is precedent from the board that says the test is not the actual intent of the speaker or the actual effect on the listener. So it's an objective test, right? Yes, sir. So the fact that the board here concludes something that it doesn't seem like the hearing officer actually concluded, which is that somehow the dissemination here was so distorted that it didn't count as dissemination. Well, the board overturned the hearing officer's legal recommendation that an atmosphere of fear and reprisal had been created so as to make a free election impossible. So the board didn't overturn any of her factual findings. And the factual finding was that eight or nine people heard through either firsthand or dissemination Davis's statement and an additional three heard Keating's statement, which had happened several months before the election. So the board's finding was that those statements alone and their dissemination did not create an atmosphere so full of fear and reprisal, because remember, that's the third-party standard. It's a heightened standard. Do you agree that this Westwood Hotel case is the standard that's applicable here, the factors? It is the standard in third-party cases. And in this case, the board found there were, in fact, no threats. Well, what I find curious about that is they don't look at those factors at all. They don't discuss the factors. They say that the hearing officer does and goes through each one specifically. But the board simply says, well, this was unjust, and basically that's the end of it. They don't look at any other factor at all. And to say this was unjust, that's why I ask you about the case that says, you know, the actual intent of the speaker or the effect on the listener is not what we're looking at. But that seems to be the only thing that the board looked at. In every case I can think of, including Westwood Hotel, the intent and context and the surrounding circumstances of the statements are taken into consideration. I understand that the context is part of what you're looking at. I'm not suggesting that you wouldn't look at all of it. But let me ask you, are you old enough to remember Clint Eastwood as dirty hair? Yes, but I was not allowed to watch. Oh, okay. Well, he makes a statement there, you know, go ahead, make my day. Do you think that was a threat? Let me ask this. If I train my 5-year-old granddaughter, because I am that old, to say, if you don't vote for the union, I'm going to punch you in the face. And Hulk Hogan says it, because that also shows my age, because I can't think of anybody else. Those two statements are very different. And the hearer would react very differently to those two statements. Probably they would, but let's just say that that statement is made each time by Clint Eastwood as dirty hairy. And one time he says it very, you know, straightforwardly. And the next time he smiles. And so does it change whether it's a threat? Is he holding a weapon? Think about the Statehouse case where two employees threatened another employee multiple times, and once they were holding a knife. They only threatened one employee, but the board overturned that election, because that was frightening. I mean, there does come a point where an atmosphere of fear and reprisal is reached. So there are cases. If you threaten deportation, the board has found deportation to be kind of a special threat, because that affects people's economics and their emotional state. That's different. But it seems like the board has said that the threat of violence, I'm going to hurt you, I'm going to beat you, where it's not a colloquialism that is used often in that setting, correct, is something that could be taken seriously. Could be. And so I guess what I'm trying to understand here is if it's not a subjective test, you know, then how can the board make this decision which seems to turn on almost entirely what they thought the intent of the speaker was? I don't think it actually entirely falls on the intent of the speaker, but it does take into consideration the context and the circumstances that surrounded those particular statements. And even in cases where actual threats were made, the board does in courts don't always overturn. There has to be something else. Threats followed with violence. Threats by multiple people to multiple people. Threats by multiple employees to multiple employees so that there's, so it seems more real. But in a case where there is no evidence that anyone was ever afraid of Juanita Davis, Kovach said she thought it might be serious, but that she, in fact, did not feel threatened. I mean, you can look at this a lot of different ways. And it's really, it's kind of a fascinating case because Robinson says, nah, you know, I blew it off. I wasn't really concerned. But then she tells a lot of people about what happened, which isn't what you do when you're not really concerned. You know, if you think it's a joke and you blow it off, you usually don't say anything about it. But we don't know why she did it, and that's the reason for the board's policy. If anybody can make any statement and overturn an election, then every election will be overturned. I thought that was really interesting. That's why it's such a fascinating case because the board says we don't want people to just go out and make these false statements and create problems when really nothing happened. But on the other hand, what they're doing says that I can, in fact, threaten people all I want to. I can say, you know, if this, if the union doesn't prevail, I'm going to track down everybody that voted no and beat them to the ground. But I'm just kidding. But if, in fact, people felt that that was true and it was disseminated, there comes a point, and there are cases where the board has overturned elections on the basis of threats. This is not that case. I am about to run out of time, and we still have ratification. So on the Noel Canning issue, were you going to go to that? Yes, Your Honor. If that's appropriate. With permission. Okay. Can you address whether there was an opportunity for ManorCare to raise the claim in the representation phase at a point in time that would have allowed the board to do something about it, namely to make the regional director, to reappoint the regional director with a quorum? Yes, Your Honor. When they signed the stipulated election agreement, they could have made a statement then. We did have other employers who added statements to the stipulated election agreement about the regional director's appointment, but it might have been invalid. We also have an executive secretary who was taking pleadings from employers about various things during the Noel Canning process. So there were opportunities to bring it to the board. Remember, the board, we had a full board before this election occurred. So there were, even though there was not a pre-election hearing, could have been written into the stipulated election agreement or brought to the attention of the executive secretary who brings it to the board. What would have happened? What do you mean it could have been written into the stipulated election agreement just as a coda to it? Right. So it's like a preservation of an objection or something? Yes. And other companies were doing that? Yes. And how did the board respond to that? The board didn't then say they had waived those. I mean, if you had raised it in the election proceedings, you wouldn't have waived it. No, but I mean, how did the board respond to it on the merits? I don't know that anyone specifically asked for a transfer. I mean, I haven't seen that that specific question was raised. I'm not even talking about a transfer. To me, that's not the action that I care about, at least, the transfer, because the transfer rules, it wasn't entirely clear to me that they would be appropriate in this context. I mean, the action that I care about is the possibility that the board could have appointed the regional director, because at that point it has a quorum, so the regional director can be validly appointed. As to that, did anybody raise – I take it the reason people raised the claim, if they did what you're saying they did, is not because they wanted a transfer. To preserve the issue. And I don't – I mean, the board certainly did not reappoint any regional directors before regional director Wallace was reappointed. Yeah, I'm not saying that it had to reappoint anybody. I'm just wondering, how did the board respond? If somebody enters into a stipulated election agreement and then, as you say, adds a coda to the effect that, oh, by the way, we're preserving an objection to the regional director, what happened with that? All I can tell you is that it preserved the issue. I don't know of any papers that went from the board to the employer. Okay. All right. Does that answer your question? I think – Well, let me ask – can I ask a follow-on, which is, if there were no stipulated election agreement, then were there cases in which there was no stipulated election agreement and the claim was raised that the regional director was invalidly appointed? I am sure there were. And how would that have happened? What would be the procedural mechanism by which it would have been raised? It would be – it would have been raised in a pre-election hearing. So the pre-election hearing concerns the definition of the bargaining unit and things like that, and one of the claims that could have been raised is? Could have been raised, right. I see. So could Medicare have declined the stipulation, or is the only way that they do that to request a hearing? There are three different kinds of election agreements. So you can sign those, or you can go to a pre-election hearing, and that's where you work out who's in the bargaining unit, those kinds of issues. All right. So the issue about rerunning the election. Rerunning the election is not the quick and simple fix Medicare has suggested. In the American Federation of Labor Boar v. Greyhound Supreme Court cases, the Supreme Court recognizes that the reason there is no direct review of election cases under the National Labor Relations Act is because elections are intended to go – to happen quickly. The board's processes ensure that elections happen pretty quickly after an election petition is filed. We don't wait around. If Regional Director Walsh had not been in place, the election would have happened on the same day or very close to that day because we have GPRA goals and targets to meet in setting in elections. Elections don't sit around for a year, and the reason is because, as this court pointed out in Amalgamated Clothing and Textile Workers, delay almost inevitably works to the benefit of the employer. The longer you delay, the less likely the employees get their free, uncoerced choice. I know that's an article of faith, but vis-a-vis the employer, the employees are nervous chickens at every moment, but they're not, in the board's view, vis-a-vis people who threaten to slash tires. For them, employees are tough, stand-up people. Is that a fair summary? I don't know that I would go that far, Your Honor. But in the give and take of elections, people do see it. My answer would be that, on the one hand, you're dealing with a third party, on the other hand, you're dealing with the employer. That is a very good answer. I adopt it as my answer. I ratify that answer. I adopt it as my answer. Thank you. I don't know if I have any time left, Your Honor. Two minutes, it appears. No time. Okay. Well, it appears you didn't have any time left, but we'll give you two minutes. Thank you. I'll be very quick. Just a couple of things. There was a question about whether there's any case that goes the other way, and I would say the Pacific Micronesia case of this court was actually two elections. In the first election, it was overturned by the board based on third party threats that were adverse to the union, so it was overturned in favor of the union. This court ultimately held that because the threats were not even by employees, they were by legislators or people in the community, and they were totally unrelated to how you voted or the election. So, I mean, there are cases that go that way. I can't cite any other, but I think what's interesting in that case, though, is that this court says, although the type of evidence required in this case, talking about the third party threats, seems self-evident, and then it cites Westwood Horizons threats of physical violence if employees voted against the union. And that's exactly what we have here. And contrary to what the board counsel says, it wasn't just one employee who heard this. It was three employees who heard the Davis threat. It was a one-vote margin, and the board has stated, I think it was in Robert Orr, Cisco, that threats directed of physical harm directed at a determinative number of voters have historically been held to constitute that environment of fear and intimidation that warrants setting aside an election. And that's exactly what we have here. The statement that the thing I'd say about their jest argument, the hearing officer found these were said in somewhat joking manner. I don't even know what that means, in somewhat of a joking manner. There's no context to it. There's nothing that these people did. They didn't say it was a joke. And Harriet Robinson, not only was she serious enough to disseminate them, but she and Pam Britton went to the employer the next morning and reported them. You wouldn't do that if you weren't concerned about it. So with all due respect, I think that the result in this case is just far off field from Westwood Horizons, and we would request that the board's order be denied enforcement. Thank you. Thank you, Mr. Roberts. The case will be submitted.
judges: Brown, Srinivasan, Williams